UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **BARBARA J. WELLS,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:15-cv-01884-RDP |
| **CRST MALONE, INC.,** | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 25). The parties have fully briefed the motion (Docs. # 27, 32-34), and it is under submission. After careful review, and for the reasons explained below, the court concludes Defendant's Motion for Summary Judgment (Doc. # 25) is due to be granted.

**I.    Factual Background[1]**

Plaintiff worked for Defendant, a flat-bed trucking company, from 1980 to 2013. (*See* Docs. # 26-1 at 64; 26-2 at 1).[2] In 2012, Defendant employed Plaintiff as a driver recruiter in its Recruiting Department. (Doc. # 26-7 at 2). Plaintiff has testified that she was the senior recruiter in the Recruiting Department. (Wells Deposition at 47). Defendant's recruiters used

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. Notably, many of the parties' factual assertions are undisputed by the opposing party. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] This Memorandum Opinion refers to exhibits attached to Plaintiff's deposition by citing the electronic page number inserted by CM/ECF. It refers to Plaintiff's deposition testimony as "Wells Deposition" and cites to the minuscript pages of the deposition transcript.

several sources to find new truck drivers, including online applications, purchased leads, Internet advertisements, referral networks, and personal referrals. (*See* Wells Deposition at 92-102, 117-19). Defendant classified drivers into three categories. (Doc. # 26-2 at 2). First, "New Lease drivers," or owner operators, owned their own equipment, leased the equipment to Defendant, and drove the leased truck for Defendant. (*Id.*). Second, "Lease Purchase drivers" signed installment leases with Defendant to purchase equipment and drove the leased truck for Defendant. (*Id.*). Finally, truck owners could supply drivers to Defendant through a "Driver for Owner arrangement" if they owned several trucks, leased them to Defendant, and provided drivers for Defendant to use. (*Id.*).

Prior to 2012, Defendant's recruiters typically recruited all three types of drivers (*id.*), and Defendant expected each recruiter to find, on average, four owner operators per week. (*Id.*). By 2011, most of Defendant's recruiters were failing to meet that goal. (*Id.*). Plaintiff has testified that this reflected a general decline in the number of owner operators in the labor market, as truck drivers "had gotten out of that industry." (Wells Deposition at 24-25). In 2012, Hadley hired Dennis Frey as Defendant's director of recruiting. (Doc. # 26-2 at 2). Hadley assigned specific recruiters to focus on New Lease and Lease Purchase prospects respectively, but expected all recruiters to handle Driver for Owner prospects. (*Id.*). He modified the New Lease recruitment goal to two new owner operators per week. (*Id.*).

Plaintiff's June 2012 annual review stated that she met some, but not all, expectations. (Doc. # 26-7 at 2-6). Specifically, it explained that Plaintiff had failed to meet her "New Lease" recruitment goal. (*Id.* at 3). It further noted that Plaintiff had failed to meet the modified two-per-week goal instituted on June 1, 2012, in the five weeks before her annual review. (*Id.*). The review expressed doubt as to whether Plaintiff was well-placed in the recruiter position

because her recruitment rate was at 28% of the company's annual goal. (*Id.* at 4). Plaintiff's reviewer rated her performance as not meeting expectations in the categories of flexibility/change, judgment/initiative, and volume of work. (*Id.* at 5). Plaintiff's supervisor cautioned that, "[w]ith the new guidelines in place, which are reduced from recent years, [Plaintiff] must be able to meet expectations on a regular basis." (*Id.* at 6). Defendant placed Plaintiff on a performance plan, which directed her to (1) meet her weekly and quarterly recruitment goals and (2) achieve a show-to-hire ratio of at least seventy percent. (*Id.* at 7). The show-to-hire ratio measured the percentage of prospects that successfully completed orientation. (Wells Deposition at 110-11).

On October 26, 2012, Frey issued Plaintiff a written warning because of her failure to meet the weekly recruitment goal and her low show-to-hire ratio. (Doc. # 26-7 at 15). Frey explained in the warning that Plaintiff had not completed training on free media advertisement that was offered to her. (*Id.*). Moreover, Defendant had provided Plaintiff exclusive access to half of its rehire list, but Plaintiff still failed to meet her recruitment goal. (*Id.*). Frey stated that he expected Plaintiff would meet the recruitment goal of two "New Leases" per week on a consistent basis. (*Id.*). On December 4, 2012, Frey issued Plaintiff another written warning for failing to meet the recruitment goal. (*Id.* at 17).

It is undisputed that almost all of Defendant's New Lease recruiters failed to meet their respective recruiting goals. (Docs. # 32 at 4, 34 at 1). During Frey's tenure as recruiting director, he terminated three recruiters for poor performance: (1) Myron Clinton, a 47-year-old African-American male, (2) Dustin Knowles, a 28-year-old white male, and (3) Pamela Gasnik,

a 51-year-old white female.[3] (Doc. # 26-6 at 2) (listing recruiter terminations in 2012 and early 2013). Frey left his position in May 2013. (Doc. # 26-2 at 2).

In April 2013, Plaintiff transitioned from working as a recruiter to working as a recruiting specialist.[4] (Doc. # 26-6 at 2-3). As a recruiting specialist, Plaintiff tracked the progress of prospects sent to Defendant by third-party recruiters and was dedicated to processing their applicants. (Wells Deposition at 109, 112-13). The recruiters forwarded applications from drivers to Plaintiff, and, in turn, she screened the drivers and contacted the recruiters to inform them whether the driver was approved. (*Id.* at 128). Defendant cut Plaintiff's yearly salary by approximately $10,000 when it reassigned her to recruiting specialist. (*Id.* at 54). The parties dispute whether Defendant created recruitment goals for the recruiting specialist position. (*See* Docs. # 26-2 at 3; 32 at 3). Hadley has averred that the recruiting specialist had no production goals. (Doc. # 26-2 at 3). To the contrary, Plaintiff has pointed out that her June 2013 performance plan required her to properly qualify and schedule "at a minimum 2 New Lease and 4 Lease Purchase commission recruits . . . weekly." (Doc. # 26-7 at 13). In addition, Defendant continued to track Plaintiff's recruitment of New Lease drivers in the third and fourth quarters of 2013, after she had transitioned to recruiting specialist. (Doc. # 26-5 at 3-4) (stating that Plaintiff recruited three New Lease drivers in the third quarter and three New Lease drivers in the fourth quarter). Ultimately, when viewed in Plaintiff's favor, the Rule 56 record shows that the

---

[3] In 2011 and 2014, Defendant terminated three other recruiters, in addition to Plaintiff, for poor performance: (1) Kristen Saliba, a 28-year-old white female, (2) Lashun Daniels, a 45-year-old African-American female, and (3) James Miller, 72-year-old white male. (Doc. # 26-6 at 2). Of the seven identified recruiters terminated between 2011 and 2014, four were white and three were African-American. (*Id.*). Four terminated recruiters were female and three were male. (*Id.*). Five terminated recruiters were older than 40 years old on the date of termination, and two were younger than 40. (*Id.*). Neither party has provided statistical evidence about the gender, racial, and age composition of Defendant's Recruiting Department, so a statistical comparison of the terminated recruiters to the remaining recruiters is infeasible.

[4] Plaintiff's discrimination claims are not based on her transfer to this position. (Doc. # 1 at ¶¶ 17-25). Even if her claims were based on the transfer, any Title VII or ADEA claim premised on the unfavorable transfer is barred for failure to exhaust administrative remedies because she raised no such claim in her EEOC charge. (*See* Doc. # 1-1 at 1) (raising discrimination claims based on Plaintiff's termination).

recruiting specialist position had production goals based on Plaintiff's processing of prospects presented by third-party recruiters. (*See* Doc. # 26-7 at 9, 13).

Like her 2012 annual review, Plaintiff's 2013 annual review stated that she met some, but not all, expectations. (*Id.* at 8-12). It described her job title as "Recruiting" (*id.* at 8), and explained that Plaintiff had failed to meet her production goal of two New Lease drivers per week in the third quarter of 2012, the fourth quarter of 2012, and the first quarter of 2013. (*Id.* at 9). Plaintiff's numbers declined in three straight quarters. (*Id.*). She recruited an average of 1.15 drivers per week in the third quarter of 2012, 1.08 drivers per week in the fourth quarter of 2012, and 0.54 drivers per week in the first quarter of 2013. (*Id.*). The annual review stated, though, that the recruiting goal mentioned in Plaintiff's 2012 annual report was no longer applicable because she had transitioned to "a position that was accountable for the processing of all outside commission recruits and agent contractor processing." (*Id.*). Plaintiff's reviewer reported concerns that she was failing to process paperwork in a timely manner and that recruiters had to call her several times to receive necessary information. (*Id.* at 11).

In June 2013, Defendant again placed Plaintiff on a performance plan for the upcoming year. (*Id.* at 13). First, it required Plaintiff to "[c]ontact and review with all of the outside recruiters at a minimum monthly all of the program, qualification guidelines, bonus programs and needs for [Defendant's] recruiting." (*Id.*). Second, it instructed Plaintiff to process prospects' paperwork as soon as it was received and to communicate quickly with third-party recruiters. (*Id.*). In addition to the weekly production report, the performance plan stated that Plaintiff's performance would be measured by "[n]otification of any issue[s] that are not being addressed in a time sensitive manner from the outside commission recruiters." (*Id.*). Finally, the

performance plan directed Plaintiff to work with the New Lease recruiters to find additional Driver for Owner contractors. (*Id.*).

Hadley recalls that he received complaints from two third-party recruiters, Pro Drivers and Hall of Fame, about delays in processing applications and a lack of communication by Plaintiff. (Doc. # 26-2 at 3). Plaintiff does not contest this fact but testified that employees at Hall of Fame were very rude to her. (Wells Deposition at 127-28). In response to the complaints, Hadley issued Plaintiff a final written warning in August 2013. (Doc. # 26-7 at 18). In the warning, Hadley directed Plaintiff to immediately inform recruiters when she had received an application and to tell the recruiters within 24 hours whether the applicant was qualified to work for Defendant. (*Id.*). He warned Plaintiff that he wanted no more complaints about her failure to communicate or her slow processing of applications, and he indicated that he would discipline Plaintiff further if he received such complaints.[5] (*Id.*).

In August 2013, Plaintiff received a service award acknowledging her 30 years of service for Defendant.[6] (Doc. # 33-1 at 2-3). In an associated letter, Defendant's president and chief executive officer ("CEO") congratulated Plaintiff for her service to Defendant and thanked her for her loyalty to the company. (*Id.* at 2). In November 2013, Hadley terminated Plaintiff because her performance had not improved. (Doc. # 26-2 at 3-4). He assigned her duties to

---

[5] During her deposition, Plaintiff could not recall whether she saw this written warning or whether Hadley discussed the warning with her in August 2013. (Wells Deposition at 90-91). But, a witness's inability to remember an event, standing alone, generally does not create a genuine issue of fact for summary judgment purposes. *Linao v. GCR Tire Ctrs.*, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010); *Chandler v. James*, 985 F. Supp. 1094, 1100 (M.D. Ala. 1997) ("The nonmoving party must come up with evidence that negates the version of events alleged by the moving party—an acknowledgment that the event may have occurred, but the witness cannot remember, falls short.").

[6] Plaintiff's opposition brief avers that she received this award and the associated letter in August 2013. (Doc. # 32 at 6). Defendant's reply brief states that the letter contains no date or indication of its temporal proximity to Plaintiff's termination. (Doc. # 34 at 4). The copy of Plaintiff's certificate in the Rule 56 record is blurred, especially in the area where the date is located. (*See* Doc. # 33-1 at 3). Nevertheless, for purposes of this summary judgment motion only, the court accepts Plaintiff's averment that she received the award and associated letter in August 2013.

administrative assistants and did not fill the recruiting specialist role. (*Id.* at 4). No Rule 56 record evidence identifies the administrative assistants who took on these duties and no evidence identifies their gender, race, or age.

During her deposition, Plaintiff acknowledged that neither Frey, nor Hadley, nor any other supervisor made a derogatory comment to her based on her race or gender. (Wells Deposition at 37-39, 42-43). And, she stated that Frey never made a derogatory comment about her age. (*Id.* at 37-38). She recalled that Hadley once asked her about when she would retire because he was older than her at the time. (*Id.* at 38). But, she admitted that this statement might not have been derogatory. (*Id.* at 42-43).

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts

about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Analysis

Plaintiff's Complaint raises employment discrimination claims based on her termination. (*See* Doc. # 1 at ¶¶ 17-25). In particular, she alleges that: (1) Defendant terminated her because of her sex, in violation of Title VII of the Civil Rights Act of 1964; (2) Defendant terminated her because of her race, in violation of Title VII and 42 U.S.C. § 1981; and (3) Defendant terminated her because of her age, in violation of the Age Discrimination in Employment Act ("ADEA") and the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code § 25-1-22.[7] (*Id.*).

Typically, Title VII, § 1981, and ADEA discrimination claims that rely on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) ("A plaintiff typically makes a case of discrimination through indirect evidence using the burden-shifting framework set out in *McDonnell Douglas* . . . ."); *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) ("Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in

---

[7] The AADEA uses the same analytical framework as the ADEA, except that it has no requirement for a plaintiff to exhaust administrative remedies. *See Perry v. Batesville Casket Co., Inc.*, 551 F. App'x 987, 989 (11th Cir. 2014). Therefore, the court's discussion of Plaintiff's ADEA claim also applies to her AADEA claim.

9

*McDonnell Douglas* . . . ."); *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (using the *McDonnell Douglas* test for an ADEA claim based on circumstantial evidence). Plaintiff has not argued that the Rule 56 record contains direct evidence of discrimination or that a mosaic of evidence supports a triable discrimination claim. Therefore, the court will analyze Plaintiff's discrimination claims under the well-established *McDonnell Douglas* framework. (*See* Doc. # 32 at 6-11).

Under that framework, a plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Once a plaintiff has presented a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

### A. For Purposes of this Summary Judgment Motion, the Court Finds a Prima Facie Case of Gender Discrimination and Race Discrimination Under Title VII and § 1981

To establish a prima facie case for a Title VII or § 1981 discriminatory termination claim, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the

position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside of her protected class or was treated less favorably than a similarly situated individual outside her protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003). Defendant does not dispute the first three elements of Plaintiff's prima facie case, but insists that Plaintiff's discrimination claims fail on the fourth element. (Doc. # 27 at 9).

To succeed on the fourth prong of the prima facie case, Plaintiff must produce evidence that Defendant treated similarly situated, non-protected employees more favorably than her. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In the work rules/discipline context, the Eleventh Circuit has adopted a test which requires a plaintiff to show that her "comparator" is "similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct must be nearly identical." *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations omitted). "We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way." *Id.* That is, "[t]he comparator must be nearly identical to [Plaintiff] to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). The relevant inquiry in an employment-discrimination action involving discipline is whether the employer subjected the employees to different work policies. *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999)

Here, after a careful review of the Rule 56 record, the court must agree with Plaintiff that the recruiters continued to be appropriate comparators to Plaintiff even after she transferred to the recruiting specialist position. (Doc. # 32 at 9). Defendant argues that Plaintiff cannot

11

compare its treatment of her to its treatment of the recruiters because she held a different title with different responsibilities. (Doc. # 27 at 10). While undisputed Rule 56 evidence shows that Plaintiff had some different job responsibilities after April 2013, the Rule 56 record also indicates that Defendant continued to compare Plaintiff to its recruiters after her transfer by tracking how many New Lease drivers she signed up – one of the work rules at the heart of this case. (*See* Doc. # 26-5 at 3-4) (listing Plaintiff in the New Lease recruiters category after her transfer and recording that she had three New Lease drivers recruited in the third quarter of 2013 and three New Lease drivers in the fourth quarter of 2013). Indeed, in an affidavit submitted by Defendant, its director of human resources described Plaintiff as a *recruiter* terminated for poor work performance, not a recruiting specialist. (Doc. # 26-6 at 2). Because some evidence before the court indicates that Defendant continued to compare Plaintiff to the recruiters after her transfer, it is appropriate for the court to do so here as well.

The Rule 56 record creates a genuine issue of fact about whether at least two of the white male comparators identified by the parties were treated more favorably than her. Todd Grant, a white male New Lease recruiter hired by Defendant in March 2013, failed to meet the two-per-week recruitment goal during the second quarter of 2013. (*See* Doc. # 26-8 at 2, 4-5) (stating that Grant had averaged one New Lease recruit per week). While Defendant claims that Grant's weekly recruitment average rose to 1.71 per week by the time of Plaintiff's termination (Doc. # 27 at 14), this average still fell below the two-per-week goal. Likewise, Gene Garza, a white male New Lease recruiter, failed to meet the two-per-week goal in the first, second, and third quarters of 2013, but was not terminated. (Doc. # 26-10 at 4). In response to these comparators, Defendant claims that Grant and Garza had higher recruiting averages than Plaintiff when she was transferred to a new position. (Doc. # 27 at 14). But, it is clear that Plaintiff, Grant, and

12

Garza all failed to meet the recruiting standard for New Lease recruiters, and subjective comparisons of employees' relative abilities is best performed at the pretext stage of the *McDonnell Douglas* test. *Cf. Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191-92 (11th Cir. 2016) (explaining that subjective criteria play no part in determining whether a plaintiff is sufficiently qualified for a position to meet a prima facie case). Defendant's explanations about the purported differences between Plaintiff, on the one hand, and Grant and Garza, on the other, are relevant to show a lack of pretext, but they are not enough to decategorize Grant and Garza as comparators for purposes of deciding whether Plaintiff has established a prima facie case. And, while Defendant suggests that Plaintiff should have been held to higher recruitment standards because she was a senior recruiter, it also argues that it did not apply higher recruitment goals to her. (Doc. # 27 at 14 n. 6). Accordingly, the court finds sufficient Rule 56 evidence of appropriate white male comparators who were treated more favorably to conclude, for purposes of summary judgment, that Plaintiff has presented a prima facie case of sex and race discrimination.[8]

### B. Plaintiff Has Failed to Establish a Prima Facie Case of Age Discrimination in Violation of the ADEA and AADEA

For an age-discrimination claim premised on a termination, the plaintiff must show that: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). Plaintiff

---

[8] Joseph Gann, a white male recruiter for Defendant, is not a strong comparator because he was transferred to a Lease Purchase recruiting position in the second quarter of 2013 when he failed to meet the recruiting goal. (*See* Doc. # 26-9 at 5). No Rule 56 evidence addresses the salary and work conditions of Lease Purchase recruiters, so the court cannot determine whether Gann received a more favorable transfer than Plaintiff. Likewise, the court is uncertain whether Olaf Frye, a white male Lease Purchase recruiter, is a valid comparator because he worked as a Lease Purchase recruiter, not a New Lease recruiter. (Doc. # 26-11 at 4).

has made no attempt to establish an age-based prima facie discrimination case. (*See* Doc. # 32 at 6-11). Further, a review of the Rule 56 record provides no evidence to support the third element of the prima facie case, as Hadley has averred that Defendant did not fill the position after it terminated Plaintiff. (Doc. # 26-2 at 4). Because Plaintiff has not presented a prima facie case of age discrimination with regard to her termination, Defendant is due to be granted summary judgment on Plaintiff's ADEA and AADEA claims.

### C. Defendant Has Presented a Legitimate, Non-Discriminatory Reason for Terminating Plaintiff, but Plaintiff Has Not Rebutted that Reason

Once a prima facie case is established, an employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. Analysis of whether the employer has met this burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, a plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason, but must "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

Defendant has articulated its legitimate, non-discriminatory reason for terminating Plaintiff – recruiters complained about her lack of timely communication and her untimely processing of applications. (Doc. # 26-2 at 3). *See also Young v. Gen. Foods Corp.*, 840 F.2d

14

825, 829-30 (11th Cir. 1988) (explaining that the employer offered "overwhelming evidence . . . of poor job performance" as its reason for terminating the plaintiff). Plaintiff offers no evidence to rebut these complaints or to suggest that they were inaccurate. Although she received a complimentary letter from Defendant's president and CEO (Doc. # 33-1 at 2), that letter did not discuss her performance in specific aspects of her job, nor did it suggest that the president and CEO had personal knowledge about Plaintiff's competence or performance as a recruiting specialist. Indeed, the Rule 56 record shows that Defendant raised concerns about Plaintiff's communication and application processing as early as June 2013, several months before Plaintiff's termination and before she says she received the 30 year congratulations letter. (Doc. # 26-7 at 8, 11, 13). Plaintiff argues that evidence presented to support her prima facie case also supports a finding of pretext because younger white males who failed to meet the recruiting goals were retained while Defendant terminated African-American, female, and older recruiters. (Doc. # 32 at 11). However, while this evidence could be relevant to examining Defendant's motive for reassigning Plaintiff to recruiting specialist, it is irrelevant to examining whether Defendant was satisfied with Plaintiff's performance in her new role. Indeed, the Rule 56 record consistently demonstrates that Defendant was unsatisfied with Plaintiff's performance as a recruiting specialist.

Further, while on the face of the Rule 56 record Grant and Garza are comparators for the purpose of Plaintiff's prima facie case, as Defendant has noted, the decision not to terminate their employment was based on legitimate, non-discriminatory reasons. While Grant failed to meet the recruitment goal, he was a new hire in 2013 (*see* Doc. # 26-8 at 2) and recruited, on average, more drivers per week in the second quarter of 2013 than Plaintiff had recruited in the first quarter of 2013. (*See* Doc. # 26-5 at 2) (stating that Grant had recruited 0.85 drivers per

week in the second quarter of 2013). Indeed, by the fourth quarter of 2013 (the quarter in which Plaintiff was terminated), Grant's performance nearly met the New Driver recruitment goal. (*Id.* at 4) (noting Grant's weekly average of 1.69 drivers per week). Likewise, Defendant hired Garza in October 2012 (Doc. # 26-10 at 2), and Garza's recruitment average exceeded Plaintiff's average in the first quarter of 2013. (Doc. # 26-5 at 1) (reflecting a weekly average of 1.08 for Garza and 0.54 for Plaintiff). In the fourth quarter of 2013, Garza's performance met the New Driver recruitment goal. (Doc. # 26-5 at 4). Neither Garza nor Grant had three straight quarters of decreasing performance, as Plaintiff had before her transfer to a new position. Thus, the Rule 56 record shows that Garza and Grant were relatively inexperienced driver recruiters who -- despite their inexperience -- outperformed Plaintiff. As shown above, comparing Plaintiff's performance record to Garza's and Grant's performance record offers no Rule 56 evidence to refute Defendant's assertion that Plaintiff's poor performance led to her termination.

Because no reasonable jury could conclude from the record that Defendant's reason for terminating Plaintiff as a recruiting specialist was a pretext for unlawful discrimination, Defendant is due to be granted summary judgment on the Title VII, § 1981, ADEA, and AADEA employment discrimination claims in the Complaint.[9]

## IV. Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. # 25) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

---

[9] The court recognizes that, although it is often found to be useful, the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII, § 1981, or ADEA claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n. 3 (11th Cir. 2005). A plaintiff's claim will also survive summary judgment if she otherwise presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Thorough examination of all the circumstantial evidence presented in this case, however, reveals that no reasonable inference of discrimination can be raised in this case.

**DONE** and **ORDERED** this December 28, 2017.

                                                              **R. DAVID PROCTOR**
                                                              UNITED STATES DISTRICT JUDGE